# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

STEVEN ACETO, *et al.*,

        Plaintiffs,

        v.

ISLAMIC REPUBLIC OF IRAN,

        Defendant.

Civil Action No. 19-464 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

This action arises out of the bombing on June 25, 1996 of the Khobar Towers apartment complex in Dhahran, Saudi Arabia, which housed United States military personnel, including the seven service-member plaintiffs in this case. *See* Compl. ¶ 20. Nineteen U.S. Air Force personnel were killed, and hundreds more were injured. *Id.* at ¶¶ 20, 30. Also among the 31 plaintiffs are family members of service-member plaintiffs and others injured in the bombing. *See id.* ¶ 41. Plaintiffs' complaint alleges that the defendant, the Islamic Republic of Iran, is liable under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, for "provid[ing] material support and resources . . . which caused, enabled, and facilitated the terrorist attack at the Khobar Towers," Compl. ¶ 23. Although the plaintiffs have complied with FSIA's requirements for service on the defendant, Iran has failed to enter an appearance or otherwise defend against this action. *See* 28 U.S.C. § 1608(a)(4); Return of Service/Affidavit of Summons and Complaint Executed, ECF No. 19; Clerk's Entry of Default, ECF No. 25. The plaintiffs now seek the entry of a default judgment against the defendant as to liability and damages. Pls.' Mot. to Take Judicial Notice of Evid. in Prior Related Cases and for

Entry of Default J. as to Liability and Damages ("Pls.' Mot."), ECF No. 23. For the reasons detailed below, the plaintiffs' motion is granted in part and denied in part.

## I.     BACKGROUND

Several prior decisions of this Court have found the defendant liable for the Khobar Towers bombing: *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 46–51 (D.D.C. 2006) (Lamberth, J.); *Estate of Heiser v. Islamic Republic of Iran* (*Heiser I*), 466 F. Supp. 2d 229, 248 (D.D.C. 2006) (Lamberth, J.); *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 167 (D.D.C. 2010) (Lamberth, J.); *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 10 (D.D.C. 2018) (Howell, C.J.); *Schooley v. Islamic Republic of Iran*, No. CV 17-1376 (BAH), 2019 WL 2717888 (D.D.C. June 27, 2019) (Howell, C.J.). In *Blais* and *Heiser I*, the Court heard evidence and witness testimony. *See Blais*, 459 F. Supp. 2d at 46 n.4; *Heiser I*, 466 F. Supp. 2d at 250. In *Heiser I* alone, the plaintiffs' examination of witnesses, including seven expert witnesses, and offering of evidence took 17 days. *See* 466 F. Supp. 2d at 250.[1] *Rimkus*, *Akins*, and *Schooley* concluded that judicial notice of the findings of fact in *Blais* and *Heiser I* was appropriate, *see Rimkus*, 750 F. Supp. 2d at 167; *Akins*, 332 F. Supp. 3d at 9; *Schooley*, 2019 WL 2717888, at *2, and the plaintiffs here request that this Court "take judicial notice of prior findings of fact and supporting evidence imposing liability under [the FSIA] . . . on Iran" for the Khobar Towers bombing, Pls.' Mem. Supp. Mot. to Take Judicial Notice of Evid. in Prior Related Cases and for Entry of Default J. as to Liability and Damages ("Pls.' Mem.") at 7, ECF No. 24.

---

[1]     The expert witnesses in *Heiser I* were: (1) Louis Freeh, the former Director of the Federal Bureau of Investigation ("FBI"); (2) Dr. Patrick Clawson, a scholar of Middle Eastern politics who has frequently provided expert testimony regarding Iran's involvement in sponsoring terrorism' (3) Dr. Bruce Tefft, a founding member of the CIA's Counterterrorism Bureau and regular consultant on issues of terrorism; (4) Dale Watson, the former Deputy Counterterrorism Chief of the FBI, *see Heiser I*, 466 F. Supp. 2d at 260–65; (5) Dr. Thomas Parsons, a medical examiner, *see id.* at 268; (6) Dr. Dana Cable, a licensed psychologist and expert on grief process, *see id.* at 269–70; and (7) Dr. Herman Miller, an economic consultant, *see id.* at 273–74.

Rule 201 of the Federal Rules of Evidence authorizes a court to "judicially notice" adjudicative facts that are "not subject to reasonable dispute because" they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b).[2]  In this Court, Rule 201 has been applied frequently to judicially notice factual evidence developed in other FSIA proceedings "involving the same conduct by the same defendant[]," *Akins*, 332 F. Supp. 3d at 11, "even when those proceedings have taken place in front of a different judge," *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 191 (D.D.C. 2017) (citing *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009).  This avoids "the formality of having that evidence reproduced." *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 31 (D.D.C. 2012) (quoting *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 7 (D.D.C. 2011)); *see also Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 50 (D.D.C. 2012) (Lamberth, J.) (finding courts permitted "in subsequent related cases to rely upon the evidence presented in earlier litigation"); *Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 237 (D.D.C. 2012) (Lamberth, J.) (taking "judicial notice of the evidence presented in the earlier cases").  Taking judicial notice of prior findings "does not conclusively establish the facts found in those cases" in the later FSIA case. *Foley*, 249 F. Supp. 3d at 191. Rather, "based on judicial notice of the evidence presented in the earlier cases[,] . . . courts may reach their own independent findings of fact." *Anderson v. Islamic Republic of Iran*, 753 F. Supp. 2d 68, 75 (D.D.C. 2010) (Lamberth, J.); *see also Rimkus*, 750 F. Supp. 2d at 172 ("[C]ourts in FSIA litigation have adopted a middle-ground approach that permits courts in

---

[2]     "[A]djudicative facts are simply the facts of the particular case." *Nat'l Org. for Women, Wash., D.C. Chapter v. Social Sec. Admin.*, 736 F.2d 727, 737 n.95 (D.C. Cir. 1984) (Robinson, J., concurring) (quoting FED. R. EVID. 201, Advisory Committee Note).  The Rule does not govern judicial notice of "legislative facts," FED. R. EVID. 201(a), which are "those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body," *Nat'l Org. for Women*, 736 F.2d 727 at 737 n.95 (quoting FED. R. EVID. 201, Advisory Committee Note).

subsequent related cases to rely upon the evidence presented in earlier litigation — without necessitating the formality of having that evidence reproduced — to reach their own, independent findings of fact in the cases before them.").[3]

Persuaded that this approach is both "efficient and sufficiently protective of the absent defendant[]'s interests," *Akins*, 332 F. Supp. 3d at 11, this Court will adopt it and grant the plaintiffs' request to take judicial notice of the evidence presented in *Heiser I, Blais, Rimkus, Akins*, and *Schooley*, *see id.* (stating that factual evidence developed in other cases "involving the same conduct by the same defendant[] . . . admissible and may be relied upon in this case."). The evidence regarding the Khobar Towers bombing is summarized below, followed by an overview of the procedural history of this case.

### A.        The Attack on Khobar Towers

The Khobar Towers residential complex in Dhahran, Saudi Arabia "housed the coalition forces," including the U.S. military forces, "charged with monitoring compliance with [United Nations] security council resolutions." *Blais*, 459 F. Supp. 2d at 47. About 10 minutes before 10:00 pm on June 25, 1996, "a large gasoline tanker truck pulled up" and parked "alongside the perimeter wall of the Khobar Towers complex." *Heiser I*, 466 F. Supp. 2d at 252; *see also* Compl. ¶ 20. Security guards near the top of one of the towers, Building 131, "started to give warnings about the unusual vehicle location," but the truck exploded "within about 15 minutes." *Heiser I*, 466 F. Supp. 2d at 252; *see also* Compl. ¶ 21. The blast "sheared off the face of Building 131," *Heiser I*, 466 F. Supp. 2d at 252, and "shattered windows up to half a mile away,"

---

[3]        The D.C. Circuit has endorsed the use of judicial notice to establish facts in FSIA terrorism cases. In *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1049 (D.C. Cir. 2014), the D.C. Circuit held that the plaintiffs had "met their burden of producing evidence 'satisfactory to the court'" to establish subject matter jurisdiction under the FSIA, where the only evidence linking North Korea to the victim's disappearance was a South Korean court's conviction of a North Korean agent, of which the district court had taken judicial notice, *id.*; *see also Owens v. Republic of Sudan*, 864 F.3d 751, 789 (D.C. Cir. 2017).

Compl. at 1–2. Subsequent "investigation determined that the force of the explosion was the equivalent of 20,000 pounds of TNT. The Defense Department said that it was the largest non-nuclear explosion ever up to that time." *Heiser I*, 466 F. Supp. 2d at 252.

## B. The Defendant's Role

Iran "has been designated a state sponsor of terrorism" by the U.S. Department of State "since January 19, 1984." *Blais*, 459 F. Supp. 2d at 47; *see also, e.g.*, *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 77 (D.D.C. 2018); U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/j/ct/list/c14151.htm. Prior proceedings have found that Iran planned and supported the Khobar Towers bombing.[4] Both the Ayatollah Ali Khamenei, the Supreme leader of Iran at the time, and the Minister of Intelligence and Security "approved" the attack. *Heiser I*, 466 F. Supp. 2d at 252. The truck bomb used was "assembled" at a base in Lebanon's Bekaa Valley "jointly operated by the Iranian Revolutionary Guard Corps ("IRGC") and by the terrorist organization known as Hezbollah;" the individuals who carried out the bombing called themselves "Saudi Hezbollah." *Id.*

These conclusions are based in part on the testimony of four key expert witnesses in *Blais* and *Heiser I*. Louis Freeh, who was director of the FBI at the time of the bombing, and Dale Watson, then deputy counterterrorism chief of the FBI, testified in *Heiser I* based on their oversight of the the FBI's "massive and thorough investigation of the attack, using over 250 agents." *Id.*; *see also id.* at 260–62. "Based on that investigation, an Alexandria, Virginia, grand jury returned an indictment . . . against 13 identified members of the pro-Iran Saudi Hezbollah organization." *Id.* at 252. During its investigation, the FBI interviewed six members of Saudi Hezbollah who "admitted to the FBI their complicity in the attack on Khobar Towers, and

---

[4] Under the FSIA, Iran is "vicariously liable for the acts of its officials, employees, or agents." 28 U.S.C. § 1605A(c)(4).

admitted that senior officials in the Iranian government provided them with funding, planning, training, sponsorship, and travel necessary to carry out the attack on Khobar Towers." *Id.* at 253. Both Freeh and Watson testified to their conclusions, based on information gathered in their investigations, that "Iran, [the Ministry of Information and Security ("MOIS")], and IRGC were responsible for the Khobar Towers bombing carried out by Saudi Hezbollah." *Id.* at 264.

Further, Dr. Patrick Clawson provided expert testimony in *Heiser I* that "the government of Iran, MOIS, and IRGC were responsible for the Khobar Towers bombing, and that Saudi Hezbollah carried out the attack under their direction." *Id.* at 253. This conclusion was "based on his involvement on a Commission investigating the bombing, his top-secret security clearance, his discussions with Saudi officials, as well as his academic research on the subject." *Id.* at 253. Dr. Bruce Tefft, a former member of the CIA's counterterrorism bureau, supported Clawson's "expert opinion," based on "publicly available sources that were not inconsistent with classified information known to him from his time at the CIA" that "the Islamic Republic of Iran and the Iranian Revolutionary Guards Corp were responsible for planning and supporting the attack on Khobar Towers." *Id.* at 253–54.

### C.    The Instant Plaintiffs

The plaintiffs in this action include seven service members who "suffered physical and psychological injuries" as a result of the Khobar Towers bombing, Compl. ¶ 30, and 17 of their family members, *see id.* ¶ 41. The remaining plaintiffs are family members of service members injured in the bombing who recovered as plaintiffs in a previous suit. *See Akins*, 332 F. Supp. 3d at 47. The service-member plaintiffs and the family-member plaintiffs are described below.

#### 1.    *Steven Aceto, Jennifer Scheidel, and one family member.*

On June 25, 1996, Steven Aceto was working as an air munitions systems specialist in the U.S. Air Force, deployed to Saudi Arabia, and living at Khobar Towers in Dhahran. Decl. of

Pl. Steven Aceto ("Aceto Decl.") (Sept. 2, 2019) ¶¶ 4–5, ECF No. 24-1.  At the time of the

bombing, Aceto was playing cards in the day room at his quarters in the Khobar Towers.  *Id.* ¶ 5.

When the explosion "blew in" the sliding glass door behind Aceto "with tremendous force," he

was knocked off the couch where he was sitting and onto the floor.  *Id.*  Aceto felt as though he

had "been hit in the head with a baseball bat," and he lay on the floor for "at least 5 minutes," his

arms and hands bleeding from cuts.  *Id.*  Aceto eventually made his way downstairs and outside,

where he elected not to seek medical treatment because "there were many others much more

badly hurt."  *Id.* ¶ 6–7.  Aceto was unable to contact his wife, Jennifer Scheidel, who was also an

Air Force service member living in the Khobar Towers, or his parents "for quite a long time."

*Id.* ¶ 8.  As a result of the attack, Aceto has a scar on his right hand, continues to experience

ringing in his ears, and has symptoms of PTSD, including bad dreams, trouble sleeping,

depression, and crippling anxiety.  *Id.* ¶ 11–12.  Recently, Aceto began receiving treatment for

PTSD, *see* Att. (VA Medical Record, dated February 14, 2019), ECF No. 24-1 at 7–9, which was

formally diagnosed after the VA had rated him as 50% disabled, *see* Aceto Decl. ¶ 13; *see also*

Att. (Letter from VA, dated January 22, 2018), ECF No. 24-1 at 5 (lacking list of underlying

disabilities).

Two of Aceto's family members are plaintiffs in this lawsuit: his ex-wife, Jennifer

Scheidel; and his mother, Diane Snow.  Scheidel is also a service-member plaintiff.[5]  On June

25, 1996, Jennifer Scheidel was a Senior Airman in the U.S. Air Force deployed to Dhahran Air

Force Base in Saudi Arabia and living at Khobar Towers.  Decl. of Pl. Jennifer Scheidel

("Scheidel Decl.") (Sept. 2, 2019) ¶¶ 6–7, ECF No. 24-1.  The evening of the attack, she was

working a night shift at a munitions bay at Dhahran Air Force Base, which was three or four

---

[5]     Scheidel is seeking damages both as a service member and as a family member of Aceto, *see* Compl. ¶¶ 30, 41, but Aceto does not seek damages as Scheidel's family member, *see* Compl. ¶ 41; *see also* Pls.' Mem. at 9.

miles away from the Khobar Towers. *Id.* ¶ 8. Scheidel realized that the Khobar Towers had

been bombed when she felt the ground shake and saw a mushroom cloud rising from the

residential complex. *Id.* at ¶ 8–9. Immediately, Scheidel worried that the attackers might target

the Air Force Base next, and she feared for her safety in the munitions bay, which contained

"dangerous high explosives." *Id.* ¶ 10. Her only information came from "news reports at first on

the radio and then later on the television" reporting "massive causalities." *Id.* ¶¶ 12–13. Unable

to contact her husband, who she knew "was still at the Khobar Towers," *id.* ¶ 11, she became

"convinced that he had died," *id.* ¶ 14. When Scheidel finally returned to the Towers the next

day, there was "glass and rubble everywhere, and bloody footprints." *Id.* ¶ 15. For the next two

months, Scheidel and Aceto stayed at Khobar Towers, amid "constant threats of new bomb

attacks," *id.* ¶¶ 17–18, and Scheidel became convinced that "neither Steven nor I would make it

back alive," *id.* ¶¶ 18. "A few years" after the bombing, Aceto and Scheidel "separated and

divorced." *Id.* As a result of the attack, Scheidel suffers from chronic PTSD, with symptoms

including insomnia, nightmares, anxiety, and hypervigilance, for which she has sought treatment

from the VA. *Id.* ¶ 22–23; *see also* Att. (VA Medical Record, dated April 22, 2019), ECF

No. 24-1 at 18–20.

Aceto's mother, Diane Snow, was at work when she heard the news about the bombing.

Decl. of Pl. Diane Snow ("Snow Decl.") (Sept. 2, 2019) ¶ 8, ECF No. 24-1. She "immediately

felt terribly anxious about Steven," *id.* ¶ 8, and believes she "left work shortly after hearing the

news," *id.* ¶ 9. That evening, and the next day, her "concern and anxiety only increased as [she]

waited for some word about whether Steven was alright, hurt, or even worse, killed." *Id.* ¶ 10.

Snow "felt shaken up and sick to her stomach," *id.* ¶ 11, until she received a phone call from

Steven 24 hours later, *id.* ¶ 12. Snow perceives that her son "has kept most of his feelings about

what happened at the Khobar Towers bottled up," in part "to avoid upsetting" her. *Id.* ¶ 13.

When her son did finally "open[] up about it a little" to her, *id.* ¶ 14, Snow became an "emotional

wreck just hearing about how it affected him and what he still going through," *id.* ¶ 15.

### 2. *James A. Burgess and Four Family Members*

On June 25, 1996, James A. Burgess was a Staff Sergeant with the U.S. Air Force,

stationed at Dhahran Air Base, and living in the Khobar Towers. Decl. of Pl. James A. Burgess

("Burgess Decl.") (Sep. 2, 2019) ¶ 5, ECF No. 24-1. At the time of the bombing, Burgess was in

his bedroom at Khobar Towers, where the ground shook with such force that Burgess was

"thrown on the floor." *Id.* ¶ 6. Burgess then ran to the day room, where "there were shards of

broken glass everywhere," and a big piece of glass cut his forearm. *Id.* ¶ 7. Burgess eventually

received "first aid" for the cut but has a scar "to this day." *Id.* ¶ 9. Burgess remained at Khobar

Towers for another two months, during which he remained "concerned there could be another

attack at any time." *Id.* ¶ 11. Burgess still has "flashbacks to the sights and sounds of that day,"

experiences nightmares, and "sometimes outbursts of temper." *Id.* ¶ 13. That said, Burgess has

"never sought treatment for PTSD." *Id.* ¶ 13.

Four of Burgess's family members are plaintiffs in this lawsuit: his father, James H.

Burgess; his mother, Beverly Fitzhugh; his ex-wife, Dafphanie Burgess; and his daughter, Brandi

Burgess. Burgess's then-wife, Dafphanie Burgess, learned about the bombing at Khobar Towers

on the television news. Decl. of Pl. Dafphanie Burgess ("D. Burgess Decl.") (Sep. 2, 2019) ¶ 8,

ECF No. 24-1. She attempted to call her husband's unit and his commanding officer and felt

"panic" when she was unsuccessful. *Id.* ¶ 10. A "day or two later," she "heard from James" that

he was alright, aside from "a bad cut." *Id.* ¶ 11. Nevertheless, in the weeks that followed the

attack, she was afraid for her husband's life and worried desperately that their daughter Brandi

could "miss getting to know her father." *Id.* ¶ 12. When her husband finally returned home, she

noticed "he seemed different, distant, and disengaged," and "frequently had nightmares." *Id.*

¶ 13. Dafphanie and James Burgess "separated in 1999" and "were formally divorced in 2017,"

*id.* ¶ 15, but they "co-parented" their two children, *id.* ¶ 14, and "remain good friends," *id.* ¶ 17.

She believes that the terrorist bombing affected Burgess very deeply and that their relationship

was never the same afterwards. *Id.* ¶ 16.

James A. Burgess's father, James H. Burgess, also learned about the bombing on the

television news. Decl. of Pl. James H. Burgess ("J.H. Burgess Decl.") (Sep. 2, 2019) ¶ 8, ECF

No. 24-1. When he saw images of "rubble and ruins" at the Khobar Towers, his heart "started

beating very fast" because he feared his son might have been killed. *Id.* This "period of not

knowing seemed to stretch out forever," *id.* ¶ 10, until, finally, Dafphanie Burgess was able to

report that Burgess's son was alright, *id.* ¶ 11. His son "seemed more serious, more directed at

getting things done" on his return. *Id.* ¶ 12. James H. Burgess believes that "the terrorist attack

gave [him] some of the worst days of [his] life, and that it adversely affected James as well." *Id.*

¶ 15.

When Burgess's mother, Beverly Fitzhugh, first heard about the terrorist attack at the

Khobar Towers on the television news, she did not "make the connection" to her son. Decl. of

Pl. Beverly Fitzhugh ("Fitzhugh Decl.") (Sep. 2, 2019) ¶¶ 7–8, ECF No. 24-1. Dafphanie

Burgess soon called to say that the bombing had been at Burgess's air base, *id.*, and Fitzhugh

was immediately "afraid that [she] might have lost Jimmy," *id.* ¶ 8, and became "very agitated

and distressed," *id.* ¶ 9. Even after she heard from her son, she "remained on edge" and "had to

take medication." *Id.* ¶¶ 9–10. When Burgess returned home, she noticed that her normally

"happy, outgoing" son, *id.* ¶ 5, was "withdrawn and didn't seem to want to talk about what had

happened," *id.* ¶ 11.  To this day, she is "very emotional about what happened to Jimmy."  *Id.* ¶ 12.

Burgess's daughter, Brandi Burgess, was a little over one year old on June 25, 1996, Decl. of Pl. Brandi Burgess ("B. Burgess Decl.") (Sep. 2, 2019) ¶ 4, ECF No. 24-1, and her mother told her about her father's experience in the bombing fourteen years later, *see id.* ¶¶ 9–10.  Throughout her childhood, Brandi Burgess found "it . . . very hard to have any real relationship" with her father, *id.* ¶ 6, and she attributes some of her father's remoteness and distance to the attack, *id.* ¶¶ 9–10.  She believes that but for her father's experience in the terrorist attack, "things could have been much better."  *Id.* ¶ 15.

### 3.  *Greg Cassidy Caldwell and One Family Member*

On June 25, 1996, Greg Cassidy Caldwell was a Senior Airman with the U.S. Air Force deployed to the Air Force Base in Dhahran, Saudi Arabia.  Decl. of Pl. Greg Cassidy Caldwell ("Caldwell Decl.") (Sep. 2, 2019) ¶ 4, ECF No. 24-1.  The evening of the bombing, Caldwell, who lived in the Khobar Towers complex, was in the day room with his roommate when a "very loud boom reverberated through the area."  *Id.* ¶ 5.  Caldwell was "suddenly thrown against the wall."  *Id.*  Caldwell got up and hurried to the first aid and triage center, where he gave basic first aid to seriously injured servicemembers.  *Id.* ¶ 7.  Later in the day, Caldwell noticed that he had glass embedded in his own leg and feet, and, weeks after the bombing, Caldwell sought medical treatment for chest pains from a bruised sternum sustained when he was thrown against the wall. *Id.*; *see also* Att. (Medical Record, dated July 6, 1996), ECF No. 21-4 at 52.  Caldwell stayed in Saudi Arabia for a bit of time after the attack, helping the FBI sort through the rubble, *id.* ¶ 10, and helping to load injured servicemembers into transport planes, *id.* ¶ 9.  He received a Commendation Medal from the Air Force and his unit received an Outstanding Unit Award for Valor for work in the aftermath of the bombing.  *Id.* ¶ 12; Att. (Commendation Medal, dated

Dec. 23, 1999), ECF No. 24-1 at 54–55; Att. (Supplemental Evaluation Sheet, dated Sept. 6, 1996), ECF No. 24-1 at 57. When Caldwell returned, he "drank too much" and struggled with claustrophobia, Caldwell Decl. ¶ 14, for which he saw "a doctor . . . because it was so bad," *id.* ¶ 15. In 2009, he started "a Facebook Khobar Towers Survivors group" that "now has 570 members" who, Caldwell says, have found "some common ground," although the group "sometimes triggers some bad feelings and recollections when people post photos and videos from that time." *Id.* ¶ 17. Although Caldwell did not seek treatment for PTSD at first, because he "wanted to avoid any stigma associated with" the disease, he eventually received a diagnosis of PTSD "with specific phobia," the claustrophobia. Att. (VA Benefits Letter, dated July 26, 2019), ECF No. 24-1 at 59. The VA has given Caldwell a 70 percent disability rating, 50 percent of which is attributable to the PTSD and 10 percent of which is attributable to tinnitus, *id.* (attributing 10% to four other injuries which Caldwell does not aver were related to the attack), which Caldwell "believe[s] was also caused by the blast," Caldwell Decl. ¶ 15.

One member of Greg Cassidy Caldwell's family, his mother, Sandra Caldwell Blanton, is also a plaintiff in this lawsuit. Sandra Caldwell Blanton heard about the attack from her son's closest friend, who reported that Caldwell had not been killed. Decl. of Pl. Sandra Caldwell Blanton ("Blanton Decl.") (Sep. 2, 2019) ¶ 11, ECF No. 24-1. Nevertheless, Blanton worried about how badly he may have been injured until she spoke with him a day or two after the bombing. *Id.* ¶¶ 12–13. The two months after the attack, when her son remained at Khobar Towers, were "very difficult and anxious" because she "worried that there could be another terrorist attack," and Blanton began to take anti-anxiety medication. *Id.* ¶ 14. When her son returned home, she noticed that he was fearful of "closed spaces and had "become quieter" and "less outgoing." *Id.* ¶ 16.

#### 4. *Shelley Cohen and Two Family Members*

On June 25, 1996, Shelley Cohen was a Senior Airman with the U.S. Air Force deployed to the Air Force Base in Dhahran, Saudi Arabia and assigned to living quarters at Khobar Towers. Decl. of Pl. Shelley Cohen ("Cohen Decl.") (Sep. 2, 2019) ¶ 4, ECF No. 24-1. That day, Cohen was watching television in the day room when "all of a sudden . . . I could not breathe." *Id.* ¶¶ 6–7. There had been "an incredibly loud explosion" and a sliding glass door had "bl[own] in with tremendous force." *Id.* ¶ 7. Cohen's leg and feet were cut by glass from the door. *Id.* ¶ 9. Cohen did not seek medical care for her injuries until days later, when the cuts on her leg had become infected. *Id.* ¶ 12–13. She received a Purple Heart for these wounds. Att. (Purple Heart Certificate, dated August 7, 1996), ECF No. 24-1 at 90–91. In the subsequent 80 days that Cohen spent in Saudi Arabia, she became "obsessive" about "picking up pieces of glass." *Id.* ¶ 16. Cohen felt she needed "healing and therapy" because of the feelings of helplessness resulting from the bombing, but, afraid that it might hurt her career to seek help within the Air Force, she sought out a private psychologist after she returned home. *Id.* ¶ 17. Cohen believes that she carries the "profound negative effect[s]" of the bombing on her to this day. *Id.* ¶ 21; *see also id.* ¶ 19.

Two members of Shelley Cohen's family are also plaintiffs in this lawsuit: her mother, Barbara Ann Louisos; and her daughter, Kendall Renee Burnside. Her mother, Barbara Ann Louisos, learned about the Khobar Towers attack from Cohen's boyfriend, who reported that Cohen was injured but alright. Decl. of Pl. Barbara Ann Louisos ("Louisos Decl.") (Sep. 2, 2019) ¶¶ 8–9, ECF No. 24-1. On hearing this news, Louisos' "heart started pounding" and she felt a "rising sense of panic." *Id.* ¶ 10. She could not rest until she heard from her daughter the next day. *Id.* ¶ 11. After the bombing, Louisos found herself "crying all the time" and had

"trouble sleeping." *Id.* ¶ 13. Louisos says that, since the attack, she has taken antidepressant medication. *Id.*

Cohen's daughter, Kendall Renee Burnside, was only eight years old on June 25, 1996. Decl. of Pl. Kendall Renee Burnside ("Burnside Decl.") (Sep. 2, 2019) ¶ 6, ECF No. 24-1. That day, Burnside was with her grandmother when her grandmother received a phone call and became "very distressed." *Id.* ¶ 7. Over the next few days, Burnside did not get a chance to speak to Cohen herself and was "very confused about what was happening" and about whether her mother was alright. *Id.* ¶ 8. Burnside remained "very scared for her [mother's] safety" for the 80 days Cohen stayed in Saudi Arabia. *Id.* ¶ 10. When Cohen returned, Burnside noticed her mother was "distracted" and would "spontaneously start crying." *Id.* ¶ 11. Burnside "know[s] that the bombing attack has had more of an effect on her [mother] than she wants to let on, and it has also affected [Burnside] very deeply." *Id.* ¶ 17.

### 5. *Denny Prier and Four Family Members*

On June 25, 1996, Denny Prier was a Senior Airman with the U.S. Air Force deployed to Saudi Arabia and living at Khobar Towers in Dhahran. Decl. of Pl. Denny Prier ("Prier Decl.") (Sep. 2, 2019) ¶¶ 5–6, ECF No. 24-1. That evening, Prier was watching a film with a friend in the Khobar Tower complex, *id.* ¶¶ 6–7, when the explosion blew in a glass door and threw Prier "five or six feet across the room," *id.* ¶ 8. In fleeing the building, Prier and his friend helped a badly injured woman get downstairs and to medical care. *Id.* Prier had a piece of glass protruding from his leg, which he pulled out himself. *Id.* ¶ 10. For two and a half months after the bombing, Prier stayed at Khobar Towers but had "constant anxiety and fear about another attack." *Id.* ¶ 12. Prier left Saudi Arabia more "jumpy and anxious," *id.* ¶ 13, and has struggled with "the sense that [he] did not deserve to survive while [his] good friend Joseph Rimkus did not, *id.* ¶ 16. "To this day," he has "a number of PTSD symptoms," including "get[ting] startled

by loud unexpected noises" and a "shorter temper." *Id.* ¶ 14. The VA has given Prier an 80%

disability rating, *id.* ¶ 15; Att. (Benefits Letter from VA, dated May 24, 2019), ECF No. 24-1 at

70–72, 50% of which is attributable to "other specified trauma or stressor related disorder," *id.* at

72 (attributing 50% to sleep apnea and 10% to tinnitus, neither of which Prier has averred relate

to the attack).

Four members of Prier's family are also plaintiffs in this lawsuit: his wife, Vicki Prier;

his mother, Monika A. Prier; his father, Thomas O. Prier; and his sister, Tene Woods. Prier's

wife learned about the attack on Khobar Towers from a news bulletin that interrupted the

television program she was watching. Decl. of Pl. Vicki Prier ("V. Prier Decl.") (Sep. 2, 2019)

¶¶ 6–7, ECF No. 24-1. Immediately, she became "very concerned" that her husband had been

injured and called family members, including her husband's father. *Id.* ¶ 8. Later that afternoon,

one of Denny's friends from the Air Force stopped by in his dress uniform to see if she was

alright, but, believing that he was there to notify her of her husband's death, she briefly felt her

"world crashing down" on her. *Id.* ¶ 9. Even after she heard that her husband was safe, she

worried about another attack during the months he remained at Khobar Towers. *Id.* ¶ 13. Prier

noticed a change in her husband's demeanor once he returned, including restlessness, anxiety,

and "startle" responses to loud noises. *Id.* ¶ 15.

Prier's father, Thomas Prier, learned about the Khobar Towers terrorist attack from his

wife. Decl. of Pl. Thomas Prier ("T. Prier Decl.") (Sep. 2, 2019) ¶ 8, ECF No. 24-1. "Based on

the timing" of the bombing, Thomas Prier "thought that Denny would most likely have been

working two or three miles away at the Air Base itself" until he learned from his daughter-in-law

that his son's schedule had changed and he might have been at the residential complex. *Id.* ¶¶ 8–

9. His concern "increased immediately," and while waiting for news about his son, he "hoped

for the best" but "feared for the worst." *Id.* ¶¶ 9–10. When Denny Prier returned home, his

father noticed that "he seemed pre-occupied and troubled at times," and was different from the

"outgoing and cheerful" person he had been before. *Id.* ¶¶ 5, 13.

Prier's mother, Monika Prier, learned about the attack on Khobar Towers from Denny's

wife. Decl. of Pl. Monika Prier ("M. Prier Decl.") (Sep. 2, 2019) ¶ 6, ECF No. 24-1. As soon as

she heard the news, "a wave of panic" passed over her. *Id.* ¶ 7. While she waited for more news

of her son, she was "very anxious," and getting news seemed to take "forever." *Id.* ¶¶ 7–8.

Denny's remaining "two-and-half or three" month tour at Khobar Towers was "a very rough

time" for the entire family. *Id.* ¶ 9. When her son returned home, she "realized he had changed"

from the "outgoing and sociable" person he used to be. *Id.* ¶ 10.

Prier's sister, Tene Woods, was 16 years old when her parents told her that there had

been an "incident" at her brother's base in Saudi Arabia, Decl. of Pl. Tene Woods ("Woods

Decl.") (Sep. 2, 2019) ¶ 8, ECF No. 24-1, and she immediately became "very concerned," *id.*

¶ 9. Woods and her brother "were very close growing up" and "stayed in close touch even while

he was away." *Id.* ¶ 6. When her brother returned home, he seemed "withdrawn and distant,"

and only recently shared some stories about the bombing with her. *Id.* ¶ 11. According to

Woods, "[t]his tragedy has a very personal meaning for me and my whole family." *Id.* ¶ 12.

### 6. *Roger A. Wilson and Four Family Members*

On June 25, 1996, Roger A. Wilson was a Senior Airman in the U.S. Air Force deployed

to Saudi Arabia and living at Khobar Towers in Dhahran. Decl. of Pl. Roger Wilson ("Wilson

Decl.") (Sep. 2, 2019) ¶ 5–7, ECF No. 24-1. Wilson was folding clothes in his bedroom "when

the blast hit," and there was a "huge roar," and "it seemed like the wall in front of [him]"

suddenly opened to the outside; he was knocked to the ground. *Id.* ¶ 9. Wilson "struggled to get

up" and stumbled through the "dark," "dust and smoke," "toward the day room where [he] knew

that [his] suite-mate Millard Campbell had been[,] but there was nothing there but rubble and
[Wilson] could not enter." *Id.* ¶ 9. Later, Wilson learned that Campbell had died. *Id.* Wilson
then "went to see if I could help" another friend, George Anthony, who was trapped in a
bedroom, electrocuted by a live wire and unable to stand. *Id.* ¶ 10–11. Wilson "supported"
Anthony as they "found a way out" and to the triage area, where Wilson received stitches for a
large wound on his forehead. *Id.* ¶ 11. In recognition for saving Anthony's life and for his own
injuries, Wilson received the Airman's Medal and the Purple Heart. *Id.* ¶ 12; Att. (Airman's
Medal Certificate, dated November 6, 1996 and Purple Heart Certificate, dated August 26,
1996), ECF No. 24-1at 26–29. As a result of the attack, Wilson has "dead spots" in his memory,
tinnitus in both ears, and has nightmares and anxiety in large crowds. *Id.* ¶ 15. The VA has
given Wilson a disability rating of 90%. *Id.* ¶ 16; Att. (VA Benefits Letter, dated August 9,
2019), ECF No. 24-1 at 31 (lacking chart showing attribution to specific disabilities).

Four of Wilson's family members are plaintiffs in this lawsuit: Wilson's fiancée at the
time of the attack, Annie Sanders-Clahar; his deceased mother Mary O'Neil, whose estate is
represented by Lindsay O'Neil; Lindsay O'Neil, Wilson's step-father; and Wilson's half-brother,
Brian Wilson. Sanders-Clahar was alone at the off-base housing she shared with Wilson near
Elgin Air Force Base in Florida when she learned about the attack at Khobar Towers on the
television news. Decl. of Pl. Annie Sanders-Clahar ("Sanders-Clahar Decl.") (Sep. 2, 2019)
¶¶ 5– 6, ECF No. 24-1. She felt "panic and anxiety when [she] realized that [Wilson] may not
have survived." *Id.* ¶ 7. When Wilson returned home, Sanders-Clahar felt that he had changed
and found their relationship strained — they "had communicated very well before the attack, but
now were unable to." *Id.* ¶¶ 10–11. Leading up to the dissolution of their marriage plans,

Sanders-Clahar struggled knowing that Wilson was "suffering and battling demons, and [she] would not be able to help him." *Id.* ¶ 15.

The estate of Wilson's mother Mary O'Neil, who passed away on June 18, 2019, is also a plaintiff in this case. Decl. of Pl. Lindsay O'Neil as Administrator of the Estate of Mary O'Neil ("M. O'Neil Decl.") (Sep. 2, 2019) ¶ 4, ECF No. 24-1; Att. (Letter in the Matter of the Estate of Mary O'Neil, dated August 20, 2019), ECF No. 24-1 at 42. Upon hearing news of the bombing, she became "extremely upset and emotional," M. O'Neil Decl. ¶ 6, and "was crying much of the time," *id.* ¶ 7. After Wilson returned home, his mother noticed that he "seemed quieter, more cautious, and more careful about his surroundings." *Id.* ¶¶ 11–12.

Lindsay O'Neil has "been a father to [Wilson] in every way" since O'Neil married Wilson's mother, Mary O'Neil, when Wilson was two years old. Decl. of Pl. Lindsay O'Neil ("L. O'Neil Decl.") (Sep. 2, 2019) ¶ 4, ECF No. 24-1. O'Neil learned about the bombing at the Khobar Towers from his wife, who had seen a report on the late-night news. *Id.* ¶ 9. The O'Neils did not hear any news about Wilson "[f]or several days and nights," which they spent "pacing and praying." *Id*. ¶ 10. As a result of the attack, O'Neil sensed that Wilson was "still curious and engaging, but [that] there was also an underlying sadness." *Id*. ¶ 14. To O'Neil, "something changed for [Wilson] after the bombing, and he was never the same person he had been before." *Id*. ¶¶ 14–15.

Brian Wilson was living with his father on June 25, 1996, and they received a telephone call about the attack on Khobar Towers. Decl. of Pl. Brian Wilson ("B. Wilson Decl.") (Sep. 2, 2019) ¶ 8, ECF No. 24-1. Despite growing up in a different household, Brian Wilson had often visited his half-brother, *id*. ¶ 4, and "regarded him as my role model," *id.* ¶ 3. As a result of the bombing, Brian Wilson sensed that his half-brother had "lost some of his zest for life." *Id*. ¶ 11.

Brian believes that "[w]hat Roger went through really affected him and everyone who was close to him, including me." *Id.* ¶ 12.

### 7. *Five Family Members of Frank David Sills III*

Air Force service member Frank David Sills III suffered disfiguring face and leg injuries, as well as lasting psychological injury, in the Khobar Towers bombing, for which he was awarded $5,000,000 as a plaintiff in *Akins*. 332 F. Supp. 3d at 14, 47. As was described in *Akins*, Sills

> sustained 'a substantial amount of damage to [his] left calf where [he] lost some tissue and muscle,' requiring six months of recovery before he was able to walk without crutches. Sills also required 'several [ ] reconstructive surgeries to [his] face.' Sills suffers from 'a generalized anxiety disorder' and 'severe panic attacks and chronic sleep impairment,' as well as survivors' guilt.

*Id.* at 14 (quoting Pls.' Damages Mot., Attach 2, Decl. of Frank David Sills III ("Sills Decl.") (June 25, 2018) ¶¶ 3–4, *Akins*, 17-cv-675 (BAH), ECF No. 25-2).

Five members of Frank David Sills' family are plaintiffs in this lawsuit: his father, Frank Sills, Jr.; his mother, Jenny Sills; his half-brother, Brian Achilles; his half-sister Shannon Kimbro; and his sister Kimberly Semlinger. Sills' father, Frank Sills, Jr., was "working at the fast food restaurant" that he managed with his wife when his wife "burst in," "voice shaking," to tell him that she had just heard about the bombing on the radio. Decl. of Pl. Frank Sills, Jr. ("F. Sills Decl.") (Sep. 2, 2019) ¶¶ 7–8, ECF No. 24-1. Sills became "very concerned" for his son, and he and his wife decided "to close the business early and try to find out whatever we could." *Id.* ¶¶ 8–9. "After what seemed like a long time, on the next day," they received a call from the Air Force telling them that their son was alive but injured. *Id.* ¶ 11. The day after that, their son called "from the hospital at Ramstein Air Force base in Germany" to tell them about his injuries and that "his good friend and roommate had not made it." *Id.* ¶ 12. In the years following the

bombing, Sills noticed that his son was "a very different young man" from the "cheerful and outgoing" person he had been. *Id.* ¶ 15. His son now exhibits signs of anxiety and has a "short fuse." *Id.* ¶ 14. Sills believes that the "effect of the terrorist attack was substantial" for his son and has been a "cloud" over the entire family. *Id.* ¶ 16.

Sills' mother, Jenny Sills, learned about the bombing on the radio while running an errand. Decl. of Pl. Jenny Sills ("J. Sills Decl.") (Sep. 2, 2019) ¶ 8, ECF No. 24-1. For the rest of the day, she and her husband were unable to get any news about their son, and she "feared the worst." *Id.* ¶ 13. When her son returned home, she noticed that he seemed "more subdued than had had ever been before," and that "the death of his roommate and other friends really gnawed at him." *Id.* ¶ 18. He was frequently anxious, angry, and experienced "stomach problems." *Id.* ¶ 19. "As a mother," she felt that her son "was never the same" after the bombing, and that the whole family was "adversely affected by what happened" to her son at Khobar Towers. *Id.* ¶ 21.

Sills' older half-brother, Brian Achilles, learned about the bombing at Khobar Towers from his mother, Jenny Sills. Decl. of Pl. Brian Achilles ("Achilles Decl.") (Sep. 2, 2019) ¶ 5, ECF No. 24-1. Achilles was immediately worried for his younger brother, with whom he had lived growing up, *id.* ¶3, and "thought [about] how terrible it would be if Frank David had died." *Id.* ¶ 6. When Achilles discovered that Sills was recovering at a hospital in Germany, he found a way to call his hospital room and was "so relieved to hear his voice." *Id.* ¶ 8. Achilles did not see Sills again until later that year but could tell "that he was changed." *Id.* ¶ 9. His brother, "saddened by the loss of so many of his friends," "was no longer as happy and carefree." *Id.* Achilles can tell his brother has "struggled with what he had gone through," and this has affected Achilles as well. *Id.*

Sills' older, half-sister, Shannon Kimbro, was at home when she learned about the bombing from a call from her father, Frank Sills, Jr. Decl. of Pl. Shannon Kimbro ("Kimbro Decl.") (Sep. 2, 2019) ¶ 5, ECF No. 24-1. She felt a "whirlwind of panic," and her "panic increased" when she saw "the images of the rubble and collapsed buildings" on the television news. *Id*. ¶¶ 5–6. Kimbro was "worried and anxious" and "on the edge of panic most of the time until [she] got word that Frank David, although injured, was still alive." *Id*. ¶ 7. When her brother returned, Kimbro noticed the physical scars but also "began to be aware that he was not the same happy-go-lucky and vibrant young man he had been." *Id*. ¶ 8. Kimbro noticed that her brother suffered from "deep anxiety." *Id*. ¶ 9. She has "no doubt" that her whole family was "adversely affected by what happened to Frank David." *Id*. ¶ 13.

Sills' younger sister, Kimberly Semlinger, was seventeen years old on June 25, 1996. Decl. of Pl. Kimberly Semlinger ("Semlinger Decl.") (Sep. 2, 2019) ¶ 7, ECF No. 24-1. That day was "the day the world stopped for our family," she says. *Id.* When Semlinger's mother called with the news of the bombing, Semlinger turned on the television to pictures of the "collapsed buildings and the rubble." *Id*. ¶ 8. As her parents made "dozens of phone calls to try and find out what happened" to her brother, she began to "fear the worst." *Id*. ¶ 9. That night, her family's "emotions were running out of control," and Semlinger "felt traumatized." *Id*. ¶ 10. When her brother returned home, it was "heartbreaking" to see the "mental and emotional injuries he was still suffering." *Id*. ¶ 12. Seeing her brother suffer as a result of the attack was "gut-wrenching" for her and has changed their family "forever." *Id*. ¶ 14.

### 8. *Two Family Members of Kevin Hurst*

Air Force service member Kevin James Hurst, who was asleep in his room in Khobar Towers when the bomb detonated, was awarded $2,500,000 in *Akins* for pain and suffering resulting from the bombing. 332 F. Supp. 3d at 14, 47. Hurst had "cuts on his feet from broken

glass," and now has "bulging and protruding discs that he believe[s] may have been caused at least in part by the blast." *Id.* at 41 (alteration in original) (internal quotation marks omitted).

Two members of Hurst's family are plaintiffs in this lawsuit: his mother, Cynthia Hurst; and the estate of his deceased father, James Hurst. Hurst's mother, Cynthia Hurst, had been out shopping on June 25, 1996, when she received a phone message from her husband that she should hurry home right away. Decl. of Pl. Cynthia Hurst ("C. Hurst Decl.") (Sep. 2, 2019) ¶ 9, ECF No. 24-1. When she got home, she confirmed to her husband that their son was living in the Khobar Towers and her husband showed her images of the bombing on the news. *Id.* ¶ 10. They "both cried," and she felt "anxiety, pain, and dread, which grew with every passing minute." *Id.* Hurst was unable to reach "anyone who knew anything" about her son, and "time seemed to stand still." *Id.* ¶ 12. When her son finally came home, she noticed that he "seemed very changed," *id.* ¶ 15, "more withdrawn and distant" and "no longer the happy and outgoing person he once was," *id.* ¶ 16. Hurst herself still has recurring nightmares about her experience after the bombing. *Id.* ¶ 14. Her son's struggles have changed their "small family unit forever." *Id.* ¶ 17.

Hurst's father, James R. Hurst, passed away on July 26, 2015, Decl. of Pl. Cynthia Hurst as Administrator of the Estate of James R. Hurst ("J. Hurst Decl.") (Sep. 2, 2019) ¶ 3, ECF No. 24-1, and his estate, with Cynthia Hurst as executor, is a plaintiff in this case, *see* Att. (Letters of Administration In re: Estate of James Ray Hurst, dated Oct. 14, 2015), ECF No. 24-1 at 136–37. James Hurst became "white as a sheet and looked stricken" when his wife confirmed that their son was stationed at Khobar Towers. *Id.* ¶ 9. Following the attack, even after news that their son was alright, Cynthia noticed that her husband "seemed haunted and distressed" that they had

almost lost their only son.  *Id.* ¶ 11.  Even after their son returned, Kevin Hurst's "experience coming so close to death at Khobar Towers deeply affected his father."  *Id.* ¶ 12.

### 9.  *One Family Member of Eric Dale Ziegler*

Air Force service member Eric Dale Ziegler was seriously injured in the Khobar Towers bombing and was awarded $5,000,000 as a plaintiff in *Akins*.  332 F. Supp. at 47.  Ziegler broke his neck, had deep cuts and abrasions all over his body, and was later diagnosed with a Traumatic Brain Injury and PTSD.  *See id.* at 24.

Eric Dale Ziegler's daughter, Kaylee Ziegler, is a plaintiff in this lawsuit.  Kaylee Ziegler was only five years old at the time of the Khobar Towers attack, but she remembers her mother, who was "very upset," telling her that her father "may have been injured" in an attack.  Decl. of Pl. Kaylee Ziegler ("Ziegler Decl.") (Sep. 2, 2019) ¶ 5, ECF No. 24-1.  When Kaylee visited her father in the hospital after the bombing, he was "covered in bandages, with stitches and discoloration on various parts of his body," and she was so "frightened by the stitches on his palms" that she wouldn't "hold or touch his hand."  *Id.* ¶ 6.  Her parents, who were divorced, "share[d] joint custody," and she continued to visit her "dad and his new family" after the bombing.  *Id.* ¶ 7.  She felt that her dad "seemed distant and unengaged at times" and that he suffered from "bits of moodiness and sometimes short bursts of anger," which she attributes to the Khobar Towers bombing.  *Id.* ¶ 8.

### D.    Procedural History

The plaintiffs filed this lawsuit on February 25, 2019.  *See* Compl.  As discussed, *infra* in Part III.B, the defendant was properly served under the FSIA.  When the defendant did not appear, the Clerk entered default against the defendant on September 4, 2019.  *See* Entry of

Default, ECF No. 25. The plaintiffs have filed a motion for judicial notice of prior related cases and for default judgment as to liability and damages. *See* Pls.' Mot.; *see also* Pls. Mem.[6]

## II.      LEGAL STANDARD

Federal Rule of Civil Procedure 55(b)(2) permits a court to consider entering a default judgment when a party applies for that relief. *See* FED. R. CIV. P. 55(b)(2). Nevertheless, "strong policies favor resolution of disputes on their merits" and, therefore, "'[t]he default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party.'" *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970)). Furthermore, "entry of a default judgment is not automatic," *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (footnote omitted), and so the procedural posture of a default does not relieve a federal court of its typical obligations, including its "affirmative obligation" to determine whether it has subject-matter jurisdiction over the action, *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996). Additionally, "a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant." *Mwani*, 417 F.3d at 6.

When default judgment is sought under the FSIA, a claimant must also "establish[] his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). This requirement "provides foreign sovereigns a special protection akin to that assured the federal government by FED. R. CIV. P. 55([d])." *Jerez v. Republic of Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014); *see also* H.R. REP. NO. 94-1487, at 26 (1976) (stating that § 1608(e) establishes "the

---

[6]      Plaintiffs also filed, on December 17, 2019, a notice informing the Court that Congress had extended the deadline, to February 19, 2020, for submission of applications for United States Victims of State Sponsored Terrorism Fund claims. *See* Pls.' Notice of Recent Legislative Development at 1, ECF No. 26.

same requirement applicable to default judgments against the U.S. Government under rule 55([d])").  While the "FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide," courts must be mindful that Congress enacted § 1605A, FSIA's terrorism exception, and § 1608(e) with the "aim[] to prevent state sponsors of terrorism — entities particularly unlikely to submit to this country's laws — from escaping liability for their sins." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047–48 (D.C. Cir. 2014) (quoting 28 U.S.C. § 1608(e)); *see also Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1114 (D.C. Cir. 2019).  With this objective in mind, the D.C. Circuit has instructed that "courts have the authority — indeed, we think, the obligation — to 'adjust evidentiary requirements to . . . differing situations.'" *Han Kim*, 774 F.3d at 1048 (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)).

Generally, courts in FSIA default actions must draw their "findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence." *Id.* at 1049 (quoting *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 21 n.1 (D.D.C. 2001)).  Uncontroverted factual allegations that are supported by admissible evidence are taken as true.  *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) ("Courts may rely on uncontroverted factual allegations that are supported by affidavits." (citing *Rimkus*, 750 F. Supp. 2d at 171)); *accord* FED. R. CIV. P. 56(e)(2) (authorizing court to "consider the fact undisputed for purposes of the motion" when adverse party "fails to properly address another party's assertion of fact").

The D.C. Circuit's "review of findings underlying a default judgment in a FSIA case of this sort is 'lenient.'" *Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affairs, et al.*, 892 F.3d 348, 356 (D.C. Cir. 2018) (quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 785

(D.C. Cir. 2017)), as "the courts are granted broad discretion to determine what degree and kind of evidence is satisfactory," *Maalouf*, 923 F.3d at 1114 (citing *Han Kim*, 774 F.3d at 1047; *Owens*, 864 F.3d at 785). In particular, "[i]n a FSIA default proceeding, a factual finding is not deemed clearly erroneous if there is an adequate basis in the record for inferring that the district court . . . was satisfied with the evidence submitted." *Owens*, 864 F.3d at 785 (second alteration in original) (internal quotation marks omitted).

## III. DISCUSSION

A default judgment may be entered when (1) the court has subject-matter jurisdiction over the claims, (2) personal jurisdiction is properly exercised over the defendant, (3) the plaintiffs have presented satisfactory evidence to establish their claims against the defendant, and (4) the plaintiffs have satisfactorily proven that they are entitled to the monetary damages they seek. These requirements are addressed in order below.

### A. Subject-Matter Jurisdiction under the FSIA

"The district courts . . . have original jurisdiction" over "any nonjury civil action against a foreign state" seeking "relief *in personam* with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title." 28 U.S.C. § 1330(a). The plaintiffs seek *in personam* relief, so the question is whether the defendant is entitled to immunity.[7]

"[T]he FSIA establishes a general rule granting foreign sovereigns immunity from the jurisdiction of United States courts," *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13 (D.C. Cir. 2015) (citing 18 U.S.C. § 1604), but "that grant of immunity is subject to a number of exceptions," *id.* at 13–14. The plaintiffs assert jurisdiction based on the FSIA's terrorism

---

[7]     This suit falls beyond the ten-year statute of limitations for actions brought under the FSIA's terrorism exception, *see* 28 U.S.C. § 1605A(b), but the "limitation period in § 1605A(b) is not jurisdictional," and the defendants have "forfeited [their] affirmative defense . . . by failing to raise it in" this Court, *Owens*, 864 F.3d at 804; *see also Maalouf*, 923 F.3d at 1115 (holding that a district court may not *sua sponte* raise a forfeited statute of limitations defense under 28 U.S.C. § 1605A(b)).

exception, 28 U.S.C. § 1605A, *see* Compl. ¶ 1, which abrogates a foreign state's immunity in cases where a plaintiff seeks "money damages" for "personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act" if "engaged in by an official, employee, or agent of such foreign state," 28 U.S.C. § 1605A(a)(1). That exception also requires that "the foreign country was designated a 'state sponsor of terrorism at the time of the act,'" *Mohammadi*, 782 F.3d at 14 (quoting 28 U.S.C. § 1605A(a)(2)(A)(i)(I)), and that, at that time, "the 'claimant or the victim was' a 'national of the United States,'" *id.* (quoting 28 U.S.C. § 1605A(a)(2)(A)(ii)(I)), or was a member of the armed forces, 28 U.S.C. § 1605A(a)(2)(A)(ii)(II).[8]

The plaintiffs have satisfactorily proven the applicable elements here. As already stated, Iran has been designated a state sponsor of terrorism since 1984, before the 1996 Khobar Towers bombing. Thirty of the 31 plaintiffs have averred in sworn declarations that they were United States citizens at the time of the attack.[9] Plaintiff Monika Prier, Denny Prier's mother, is German citizen, M. Prier Decl. ¶ 2, but there is jurisdiction over her claims because § 1605A waives immunity where "the claimant *or the victim*" — *i.e.*, Denny Prier — was "a national of the United States" at the time of the attack, 28 U.S.C. § 1605A(2)(A)(ii) (emphasis added); *see also La Reunion Aerienne v. Socialist People's Libyan Arab Jamahiriya*, 533 F.3d 837, 844

---

[8]        Finally, the provision requires proof that, "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim," 28 U.S.C. § 1605A(a)(2)(A)(iii), but the attack took place in Saudi Arabia, not Iran, so this requirement does not apply.

[9]        *See* Aceto Decl. ¶ 2 (attesting to the declarant's United States citizenship); Snow Decl. ¶ 2 (same); Scheidel Decl. ¶ 23 (same); Burgess Decl. ¶ 2 (same); Fitzhugh Decl. ¶ 2 (same); James H. Burgess Decl. ¶ 2 (same); Dafphanie Burgess Decl. ¶ 2 (same); Brandi Burgess Decl. ¶ 2 (same); Caldwell Decl. ¶ 2 (same); Blanton Decl. ¶ 2 (same); Cohen Decl. ¶ 2 (same); Louisos Decl. ¶ 2 (same); Burnside Decl. ¶ 2 (same); Prier Decl. ¶ 2 (same); Vicki Prier Decl. ¶ 2 (same); Thomas O. Prier Decl. ¶ 2 (same); Woods Decl. ¶ 2 (same); Wilson Decl. ¶ 2 (same); Sanders-Clahar Decl. ¶ 2 (same); Lindsay O'Neil Decl. ¶ 2 (same); Estate of Mary O'Neil Decl. ¶ 4 (same); Brian Wilson Decl. ¶ 2 (same); Jenny Sills Decl. ¶ 2 (same); Frank Sills, Jr. Decl. ¶ 2 (same); Achilles Decl. ¶ 2 (same); Kimbro Decl. ¶ 2 (same); Semlinger Decl. ¶ 2 (same); Cynthia Hurst Decl. ¶ 2 (same); Estate of James Hurst Decl. ¶ 5 (same); Ziegler Decl. ¶ 2 (same).

(D.C. Cir. 2008) (interpreting the former version of the terrorism exception to mean that "if either the claimant or the victim is a national of the United States, then immunity is waived"); *Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561, 570 (7th Cir. 2012) (interpreting the current statute to mean that "[t]he claimant and victim need not both be American citizens."); *Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d 138, 168 (D.D.C. 2016) (same).

Finally, the plaintiffs seek damages "for personal injury . . . that was caused by an . . . extrajudicial killing" for which the defendant and its agents provided "material support or resources." 28 U.S.C. § 1605A(a)(1); *see also Owens*, 864 F.3d at 778 ("[T]he plain meaning of § 1605A(a) grants . . . jurisdiction over claims against designated state sponsors of terrorism that materially support extrajudicial killings committed by nonstate actors."). To elaborate, the truck bombing that plaintiffs allege caused their injuries was manifestly an "extrajudicial killing," defined as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1992) (codified at 28 U.S.C. § 1350 note § 3(a)); *see also* 28 U.S.C. § 1605A(h)(7) (stating that the term "extrajudicial killing" in the FSIA's terrorism exception has the "meaning given" in the statute just quoted, "the Torture Victim Protection Act of 1991"). The defendant and its agents, the IRGC and MOIS, provided "material support or resources" for this extrajudicial killing, as the evidence presented in *Blais* and *Heiser I*, of which the Court has taken judicial notice, demonstrates. The evidence in those cases, described above, proves that the defendant and its agents authorized, "organized and sponsored" the Khobar Towers attack. *Heiser*, 466 F. Supp. 2d at 262. Further, this evidence showing that Iran helped to recruit, train, fund, supply, and direct Saudi Hezbollah establishes that the defendant's actions were "a 'substantial factor' in the

sequence of events that led to the plaintiff[s'] injur[ies]" and that the injuries were "'reasonably foreseeable or anticipated as a natural consequence of' the defendant's conduct." *Owens*, 864 F.3d at 206 (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)) (explaining that the jurisdictional standard for causation under the FSIA's terrorism exception" is proximate cause).

Accordingly, under 28 U.S.C. § 1605A, the defendant is not immune from this suit, and subject-matter jurisdiction may be properly exercised. *See* 28 U.S.C. § 1330(a).

## B.    Personal Jurisdiction under the FSIA

"Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction . . . where service has been made under section 1608 of [the FSIA]." 28 U.S.C. § 1330(b). Here, service was ultimately made under § 1608(a)(4).

Section 1608 first prescribes two methods by which service shall ordinarily be made, *see* 28 U.S.C. § 1608(a)(1)–(2), but these methods were "not available" to plaintiffs in this action, *Holladay v. Islamic Republic of Iran*, No. CV 17-915 (RDM), 2019 WL 4602142, at *4 (D.D.C. Sept. 23, 2019); *see also Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 49 (D.D.C. 2019), as "[t]he defendants have neither made a special arrangement for service with the plaintiffs, nor entered into any international convention governing service," *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 78 (D.D.C. 2017).

Thus, the plaintiffs initially attempted service under paragraph (a)(3) of § 1608 by sending one copy of the summons, complaint, and notice of suit, along with a Farsi translation, via DHL to the Foreign Minister of Iran. *See* Certificate of Mailing, ECF No. 8. The DHL delivery was returned, *see* Mail Returned, ECF No. 9, so plaintiffs, following § 1608(a)(4), transmitted the summons, complaint, and notice of suit, along with Farsi translations, "through diplomatic channels," *see* 28 U.S.C. § 1608(a)(4) (allowing resort to this method "if service

cannot be made within 30 days under paragraph (3)").  By this method, Iran was served on July 3, 2019.  *See* Aff. of Service at 1, ECF No. 19.[10]  There is personal jurisdiction over Iran.

### C.     The Defendants' Liability

The seven service-member plaintiffs bring claims for assault and battery, Compl. ¶¶ 28–32 (Count II), and intentional infliction of emotional distress ("IIED"), *id.* ¶¶ 34–39 (Count III).  The 25 family-member plaintiffs bring claims for intentional infliction of emotional distress, *id.*, and seek damages for solatium, pain and suffering, and loss of consortium, *id.* ¶ 40–43 (Count IV).  All claims are brought under FSIA § 1605A(c), which creates a "[p]rivate right of action . . . for personal injury or death," and provides that, "[i]n any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages."  28 U.S.C. § 1605A(c).

Section 1605A(c) does not guide courts on the substantive bases for liability that determine plaintiffs' entitlement to damages.  Consequently, courts "may rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)."  *Fraenkel*, 892 F.3d at 353; *see Estate of Heiser v. Islamic Republic of Iran* (*Heiser II*), 659 F. Supp. 2d 20, 24 (D.D.C. 2009) (applying "general principles of tort law," such as the Restatement (Second) of Torts, to determine liability); *see also Roth*, 78 F. Supp. 3d at 399 (citing *Oveissi*, 879 F. Supp. 2d at 54); *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 335 (D.D.C. 2014).  The defendant's liability is discussed in detail below, starting with the service-member plaintiffs.

---

[10]     Specifically, on July 25, 2019, the United States Department of State certified in an Affidavit of Service that it had met the requirements for diplomatic service under section 1608(a)(4) by causing delivery of a Summons, Complaint, and Notice of Suit to Iran on July 3, 2019.  *See* Aff. of Service at 1; Aff. of Service, Ex. 1, Diplomatic Notes at 2, ECF 19-1.

1. *Service-Member Plaintiffs*

All seven of the service-member plaintiffs — Steven Aceto, James Burgess, Greg Cassidy Caldwell, Shelley Cohen, Denny Prier, Jennifer Scheidel, and Roger Wilson — bring claims under the theories of assault, battery, and intentional infliction of emotional distress. As is discussed in the damages section, these plaintiffs may recover under only one theory, *see e.g.*, *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 297 (2002) ("[I]t 'goes without saying that the courts can and should preclude double recovery by an individual" (quoting *Gen. Tel. Co. of the Nw. v. EEOC*, 446 U.S. 318, 333 (1980)), but each theory of liability is nevertheless evaluated.

a. *Assault and Battery*

Battery requires an act "intending to cause a harmful or offensive contact . . . or an imminent apprehension of such a contact," and that such a contact in fact "directly or indirectly results." RESTATEMENT (SECOND) OF TORTS § 13. "Harmful contact" causes a "physical impairment of the condition of another's body, or physical pain or illness." *Id.* § 15; *see also Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 76 (D.D.C. 2010) (defining these terms). Iran acted with the intent to cause harmful contact with the residents of the Khobar Towers when it materially supported the truck bombing. *See, e.g.*, *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 102 (D.D.C. 2017) (defining material support for terrorist attacks as acts intending to cause harm). Each of the six service-member plaintiffs who was in the Khobar Towers complex at the time of the bombing avers that some harmful physical contact resulted from the bomb, so the defendant is liable to these six plaintiffs for battery.[11]

---

[11] *See* Aceto Decl. ¶¶ 11–12 (cuts and PTSD); Burgess Decl. ¶¶ 9, 13 (glass in forearm); Caldwell Decl. ¶¶ 7, 15 (bruised sternum and PTSD); Cohen Decl. ¶ 9 (cuts); Prier Decl. ¶ 10, 15 (glass in leg and trauma disorder); Wilson Decl. ¶ 10 (cut on forehead).

Assault occurs where a defendant "acts intending to cause a harmful or offensive contact with the person of the other . . . or an imminent apprehension of such a contact, and . . . the other is thereby put in such imminent apprehension."  RESTATEMENT (SECOND) OF TORTS § 21(1). "[A]cts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm," so where plaintiffs averred "that they did, in fact, fear such harm because of the attack," Iran may be held liable for assault.  *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 73 (D.D.C. 2010); *see also Valore*, 700 F. Supp. 2d at 76 (same).  Scheidel, who was at the Dhahran Air Force Base miles from the Khobar Towers complex at the time of the bombing, feared that the base would be attacked next when she felt and saw the blast, Scheidel Decl. ¶ 10, but her distance from the blast is inconsistent with "imminent apprehension."  *See* RESTATEMENT (SECOND) OF TORTS § 29 cmt. 2 (defining imminence as "so close to striking distance that he can reach the other almost at once").  The six service-member plaintiffs who were present at Khobar Towers were in imminent apprehension of harm, and Iran is liable to those plaintiffs for assault.

### b.  Intentional Infliction of Emotional Distress

"[O]ne who by extreme and outrageous conduct intentionally or recklessly cause[d] severe emotional distress to" the plaintiffs is liable for intentional infliction of emotional distress. RESTATEMENT (SECOND) OF TORTS § 46(1); *see also Heiser II*, 659 F. Supp. 2d at 26.  "Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress."  *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009); *see also Valore*, 700 F. Supp. 2d at 77 (same).  Further, all seven of the service-member plaintiffs have demonstrated, through their sworn declarations and corroborating submissions, that they suffered severe emotional and psychological distress as a result of the attack.  Four service members have been formally diagnosed with PTSD or a related trauma disorder, *see* Aceto Decl. ¶¶ 22–23 (PTSD); Scheidel Decl. ¶¶ 22–23; Caldwell Decl. ¶ 15 (PTSD); Prier

Decl., Att. (Benefits Letter from VA, dated May 24, 2019) (noting "other specified trauma or stressor related disorder). The declarations of the other three service-member plaintiffs demonstrate their significant emotional distress, both acute and chronic, resulting from having been targets of the attack. *See* Burgess Decl. ¶ 13 (describing lasting emotional distress); Cohen Decl. ¶ 17 (describing feelings of helplessness); Wilson Decl. ¶ 15 (listing psychological effects). The defendant is liable to the seven service members for IIED.

### 2. *Victims' Family Members*

The remaining plaintiffs seek to collect damages as family members of service members present in Saudi Arabia for the Khobar Towers bombing. Seventeen of these plaintiffs — Brandi Burgess, Dafphanie Burgess, James H. Burgess, Kendall Renee Burnside, Sandra Caldwell Blanton, Beverly Fitzhugh, Barbara Ann Louisos, Lindsay O'Neil, the estate of Mary O'Neil, Monika Prier, Thomas Prier, Vicki Prier, Annie Sanders-Clahar, Jennifer Scheidel, Diane Snow, Brian Wilson, and Tene Woods — are family members of service-member plaintiffs to this suit. Seven of the family-member plaintiffs — Brian Achilles, Cynthia Hurst, the estate of James Hurst, Shannon Kimbro, Kimberly Semlinger, Frank Sills, Jr., Jenny Sills, and Kaylee Ziegler — are related to service members injured at the bombing who were awarded damages in *Akins*.

The family members' theory of liability is IIED. *See* Compl. ¶¶ 34–39 (Count II). The Restatement permits recovery for those who were not a direct target of a defendant's conduct if (1) "the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] is not present" and (2) the claimant is a member of a victim's immediate family, *Heiser II*, 659 F. Supp. 2d at 26–27 (quoting DAN B. DOBBS, THE LAW OF TORTS § 307 (2000)), or the functional equivalent of an immediate family member, *see Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 337 (D.C. Cir. 2003) (extending liability under the FISA for IIED to "members of the victim's household" who were also "viewed as the functional

equivalent of immediate family members"); *see also* RESTATEMENT (SECOND) OF TORTS § 46, cmt. l (leaving "open the possibility of situations in which presence . . . may not be required").

Seventeen of the plaintiffs are plainly immediate family members — parents, siblings, spouses, and children — of victims. *See Fritz*, 324 F. Supp. 3d at 63 (observing that the "strict meaning" of immediate family is "one's spouse, parents, siblings, and children" (quoting *Heiser II*, 659 F. Supp. 2d at 28)). Five of the plaintiffs — Annie Sanders-Clahar, Lindsay O'Neil, Brian Wilson, Brian Achilles, and Shannon Kimbro — do not fall neatly into these traditional categories. O'Neil, Wilson, Achilles, and Kimbro are the functional equivalents of immediate family members and are therefore able to maintain claims for IIED. Half-siblings like Wilson, Achilles, and Kimbro "are presumed to recover" as full siblings would, *id.* (quoting *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 52 (D.D.C. 2007)), and the evidence here supports application of that presumption: Wilson, Achilles, and Kimbro all attest to their close relationships with their half siblings. Achilles grew up with his half-brother Frank Sills. *See* Achilles Decl. ¶ 3. Shannon Kimbro and Frank Sills, who share a father, did not grow up in the same house, but "were very close" as children — they "frequently got together for vacations and family events" and she spent "many happy days . . . sleeping over at their house." Kimbro Decl. ¶ 4. Brian Wilson also did not grow up in the same house as his half-brother Roger Wilson, but Brian "often visited Roger and his mother" in North Carolina, B. Wilson Decl. ¶ 5, and when Brian struggled as a teenager, he traveled "back East . . . to spend time with Roger," *id.* ¶ 6-7. Finally, plaintiff Lindsay O'Neil, although not Wilson's biological or adoptive father, was the "functional equivalent" because he lived with Wilson, as Wilson's mother's husband, and took on parental responsibilities from the time Wilson was two years old. *See* L. O'Neil Decl. ¶ 4.

Sanders-Clahar, however, was not the functional equivalent of a spouse to Roger Wilson. *Bettis*' "functional equivalent" requirement comes from *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260 (D.D.C. 2002), which "allowed recovery for intentional infliction of emotional distress to a woman who, although not legally married to the victim, had lived with him for over 20 years in a 'bond that was the functional equivalent of marriage.'" *Bettis*, 315 F.3d at 337 (quoting *Surette*, 231 F. Supp. 2d at 270). Here, by contrast, Sanders-Clahar and Wilson met in "1994 or 1995," just a year or two before the bombing, and "dated for about a year and a half" before moving in together in 1996. Sanders-Clahar Decl. ¶ 4. When Wilson returned after the bombing, he continued to live with Sanders-Clahar for an unknown period of time before their marriage plans dissolved. *Id*. ¶ 10, 12; *see also* Wilson Decl. ¶ 14. In *Surette*, the relationship between Beverley Surette and the victim, William Buckley, "was recognized by Buckley's family, his colleagues and his employer," some of whom attested to the "longstanding, loving, loyal, and trusting relationship" between Buckley and Surette. *Surette*, 231 F. Supp. at 270. Although Wilson introduced Sanders-Clahar to his family as his fiancée before he deployed to Saudi Arabia in 1996, the declarations of Wilson's family members do not mention Sanders-Clahar, *see* L. O'Neil Decl; M. O'Neil Decl; B. Wilson Decl., and the Air Force did not recognize the relationship as a marriage, *see* Sanders-Clahar Decl. ¶ 7 (observing that "no one from the Air Force called" her because she and Wilson "were not yet formally married"). Sanders-Clahar suffered real emotional distress as a result of the bombing, *see* Sanders-Clahar Decl. ¶¶ 7, 10, but "it is not within [this court's] authority to extend liability for intentional infliction of emotional distress beyond what has been allowed by the common law or authorized by the statute," *Bettis*, 315 F.3d at 337.

Iran is liable for IIED to the 24 remaining family-member plaintiffs, now called the immediate–family member plaintiffs. In this case, the defendant's conduct in materially supporting Saudi Hezbollah was "sufficiently outrageous and intended to inflict severe emotional harm upon a person who is not present," such that a victim's immediate family members need not have been at the bombing to recover for their emotional distress. *Heiser II*, 659 F. Supp. 2d at 27 (quoting DAN B. DOBBS, THE LAW OF TORTS § 307, at 834); *see Schooley*, 2019 WL 2717888, at *73 (concluding the same); *Akins*, 332 F. Supp. 3d at 38 (same). Finally, the 24 immediate–family member plaintiffs have shown, through their uncontested declarations, that they did suffer significant emotional consequences from the attack, in the days spent waiting for news of their loved ones and in the years after the attack.[12]

*     *     *

As just outlined, the service-member plaintiffs and the immediate–family member plaintiffs have established the defendant's liability under the federal private right of action against state sponsors of terrorism, 28 U.S.C. § 1605A(c), for the torts of assault, battery, and intentional infliction of emotional distress.

---

[12] *See* Snow Decl. ¶¶ 14–15 (attesting to emotional distress stemming from her experience as a result of the bombing); Scheidel Decl. ¶¶ 22–23 (same); Fitzhugh Decl. ¶ 12 (same); J.H. Burgess Decl. ¶ 15 (same); D. Burgess Decl. ¶¶ 11, 13 (same); B. Burgess Decl. ¶¶ 7, 9 (same); Blanton Decl. ¶ 14, 18 (same); Louisos Decl. ¶¶ 10, 16 (same); Burnside Decl. ¶¶ 10, 17 (same); V. Prier Decl. ¶ 13 (same); T. Prier ¶ 16 (same); M. Prier ¶¶ 9, 10 (same); Woods Decl. ¶¶ 9–10 (same); L. O'Neil Decl. ¶¶ 10, 15 (same); M. O'Neil Decl. ¶¶ 6–7 (same); Wilson Decl. ¶¶ 8–9 (same); Jenny Sills Decl. ¶¶ 13, 21 (same); Frank Sills, Jr. Decl. ¶¶ 9, 16 (same); Achilles Decl. ¶¶ 6, 8 (same); Kimbro Decl. ¶¶ 7, 13 (same); Semlinger Decl. ¶¶ 10, 14 (same); C. Hurst Decl. ¶¶ 10, 17 (same); J. Hurst Decl. ¶¶ 4, 11 (same); Ziegler Decl. ¶ 6 (same).

## D.      Damages

Turning to the allowable damages, the plaintiffs seek to recover economic, pain and suffering, and solatium damages, *see* Compl. ¶¶ 28–43 (Counts I–IV), and the damage award to which each plaintiff is entitled is described below.[13]

### 1.      *Legal Standard for Damages under Section 1605A(c)*

In actions brought under the FSIA's terrorism exception, foreign states may be liable for money damages, including "economic damages, solatium, pain and suffering and punitive damages." 28 U.S.C. § 1605A(c).  To recover, the plaintiffs "must prove that the consequences of the foreign state's conduct were reasonably certain (*i.e.*, more likely than not) to occur, and must prove the amount of damages by a reasonable estimate." *Roth*, 78 F. Supp. 3d at 402 (internal quotation marks omitted); *see also Fraenkel*, 892 F.3d at 353 (stating the same).  Courts may look to expert testimony and prior awards in determining whether the amount of damages has been proven by a reasonable estimate.  *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012); *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008).  The D.C. Circuit "review[s] the District Court's FSIA damages awards for abuse of discretion." *Fraenkel*, 892 F.3d at 356.

The evidence presented in *Blais* and *Heiser I*, of which this Court has taken judicial notice and reviewed above, has satisfactorily shown that the plaintiffs' injuries were reasonably certain and were the intended consequences of the defendants' material support of Saudi Hezbollah.  *See Schooley*, 2019 WL 2717888, at *74 (concluding the same); *Akins*, 332 F. Supp.

---

[13]      The plaintiffs' complaint also sought punitive damages, *see* Compl. ¶¶ 44–47 (Count V), but the plaintiffs withdrew this demand because "the allowability *vel non* of punitive damages imposed retroactively for events prior to enactment in 2008 of 28 U.S.C. § 1605A(c), *see* National Defense Authorization Act for Fiscal Year 2008 (NDAA), Pub. L. No. 110-181, Div. A, Tit. X, § 1083(a)(1), 122 Stat. 338, is a question on which the Supreme Court has granted certiorari.  *Opati v. Republic of Sudan*, 139 S. Ct. 2771 (2019)." Pls.' Notice of Voluntary Withdrawal of Punitive Damages Demand at 1, ECF No. 27.

3d at 39 (same).  Having concluded this, whether plaintiffs have shown the amount of economic, pain and suffering, and solatium damages by a reasonable estimate will be considered next.

### 2. *Economic Losses and Medical Expenses*

The seven service-member plaintiffs seek to recover for "medical expenses" and "economic losses."  Compl. ¶ 33.  This demand is unaccompanied by any documentation of medical bills or payments or by any evidence of lost wages or other economic injury, and so plaintiffs have failed to prove the amount of economic or medical expenses damages by a reasonable estimate.  *See Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 71 (D.D.C. 2015) (concluding the same where plaintiff had estimated his economic loss without documentation); *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 41 (D.D.C. 2016) (denying economic damages where plaintiffs did not provide documents "lending credence" to their claims of lost income); *Akins*, 332 F. Supp. 3d at 39–40 (denying economic losses for failure to support claims with sufficient evidence).  "Unlike damages for pain and suffering, lost earnings" and incurred medical expenses "are not hard to quantify, and the Court will not excuse plaintiffs' failure to support the claim for lost earnings" and medical expenses "with competent evidence."  *Moradi*, 77 F. Supp. 3d at 71.  Plaintiffs' claims for economic losses and medical expenses are denied.

### 3. *Pain and Suffering*

As discussed, the defendant is liable to the seven service-member plaintiffs for battery, assault, and intentional infliction of emotional distress, but the bar on multiple recoveries allows plaintiffs to recover only under one theory, for the single underlying harm.  *See, e.g.*, *Valore*, 700 F. Supp. 2d at 77 ("The Court notes that these plaintiffs who have claimed assault, battery, and IIED may recover under only one of any such theories, as multiple recovery is prohibited.").  Within this single-recovery framework, the "baseline assumption" applied in previous cases under the FSIA's terrorism exception is that "persons suffering injuries in terrorist attacks are

3d at 39 (same).  Having concluded this, whether plaintiffs have shown the amount of economic, pain and suffering, and solatium damages by a reasonable estimate will be considered next.

### 2. *Economic Losses and Medical Expenses*

The seven service-member plaintiffs seek to recover for "medical expenses" and "economic losses."  Compl. ¶ 33.  This demand is unaccompanied by any documentation of medical bills or payments or by any evidence of lost wages or other economic injury, and so plaintiffs have failed to prove the amount of economic or medical expenses damages by a reasonable estimate.  *See Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 71 (D.D.C. 2015) (concluding the same where plaintiff had estimated his economic loss without documentation); *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 41 (D.D.C. 2016) (denying economic damages where plaintiffs did not provide documents "lending credence" to their claims of lost income); *Akins*, 332 F. Supp. 3d at 39–40 (denying economic losses for failure to support claims with sufficient evidence).  "Unlike damages for pain and suffering, lost earnings" and incurred medical expenses "are not hard to quantify, and the Court will not excuse plaintiffs' failure to support the claim for lost earnings" and medical expenses "with competent evidence."  *Moradi*, 77 F. Supp. 3d at 71.  Plaintiffs' claims for economic losses and medical expenses are denied.

### 3. *Pain and Suffering*

As discussed, the defendant is liable to the seven service-member plaintiffs for battery, assault, and intentional infliction of emotional distress, but the bar on multiple recoveries allows plaintiffs to recover only under one theory, for the single underlying harm.  *See, e.g.*, *Valore*, 700 F. Supp. 2d at 77 ("The Court notes that these plaintiffs who have claimed assault, battery, and IIED may recover under only one of any such theories, as multiple recovery is prohibited.").  Within this single-recovery framework, the "baseline assumption" applied in previous cases under the FSIA's terrorism exception is that "persons suffering injuries in terrorist attacks are

entitled to $5 million in damages." *Kaplan*, 213 F. Supp. 3d at 35 (quoting *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 12 (D.D.C. 2012)). The baseline may be adjusted either upward or downward. An upward departure would be warranted "in the presence of 'severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic . . . or were mistaken for dead.'" *Id.* at 35–36 (quoting *Valore*, 700 F. Supp. 2d at 84). A downward departure would be warranted "in the face of 'minor shrapnel injuries or minor injury from small-arms fire.'" *Id.* at 36 (quoting *Valore*, 700 F. Supp. 2d at 84).

Pain and suffering damages are by their nature difficult to quantify. In *Schooley*, this Court relied in part on an "objective metric"— the VA disability rating — to "determin[e] the relative degree of injury suffered by each service-member plaintiff." *Schooley*, 2019 WL 2717888, at *74. That rating is the "agency's official determination regarding the extent of disabling injury sustained by service members in connection with military service." *Id.* (internal quotation marks omitted). As *Schooley* explained, "[t]he VA disability rating, which includes both mental and physical injuries in a single number, facilitates an approach to awarding damages that is generally agnostic to the mental or physical nature of the injury and further provides" an effective way of comparing injuries to ensure that similar injuries yield similar awards. *Id.*; *cf. Khaliq v. Republic of Sudan*, 33 F. Supp. 3d 29, 33 (D.D.C. 2014) ("When calculating damages amounts, 'the Court must take pains to ensure that individuals with similar injuries receive similar awards.'" (quoting *Peterson*, 515 F. Supp. 2d at 54). *Schooley*'s basic rubric is adopted in this case for the three service-member plaintiffs with relevant VA disability ratings. Thus, service-member plaintiffs rated by the VA up to 30% disabled receive a baseline award of $5,000,000; plaintiffs rated 40–60% disabled by the VA will receive an upward

departure, for a total award of $6,000,000; and service-member plaintiffs rated 70–100% disabled by the VA will receive a further upward departure, for a total of $7,000,000. *Id.* at *75. The remaining four service-member plaintiffs will be awarded damages based on the descriptive and documentary evidence presented about their injuries. *See id.* (adopting the same approach); *see also Akins*, 332 F. Supp. 3d at 40–41 (using this approach).

One plaintiff, Roger Wilson, can recover in the 70–100% disabled category. Wilson's disability rating is 90%, *see* Wilson Decl. ¶ 16; Wilson Decl.; Att. (VA Benefits Letter, dated August 9, 2019), and he will receive an award of $7,000,000.

Two plaintiffs, Greg Cassidy Caldwell and Denny Prier, can recover in the 40–60% disabled category. Of Caldwell's 70% disability rating, 50% is attributable to PTSD and 10% is attributable to tinnitus, Caldwell Decl., Att. (VA Benefits Letter, dated July 26, 2019), which Caldwell "believe[s] was also caused by the blast," Caldwell Decl. ¶ 15. The remaining 10% is attributable to other injuries that Caldwell does not aver were caused by the Khobar Towers attack and for which he therefore cannot recover. Thus, Caldwell can recover for 60% of his VA disability rating and will receive an award of $6,000,000. Similarly, the VA has given Prier an 80% disability rating, *id.* ¶ 15; Prier Decl., Att. (Benefits Letter from VA, dated May 24, 2019), 50% of which is attributable to "other specified trauma or stressor related disorder" resulting from the bombing, *id.* Fifty-percent of the disability rating is attributable to sleep apnea, which Prier has not averred was caused by the attack. *See id.* (attributing 10% to tinnitus, which is also not alleged to be attributable to the attack). Prier is therefore entitled to recover at a 50% disability rating and will receive a total award of $6,000,000.

Review of the affidavits and supporting evidence submitted by the remaining service-member plaintiffs demonstrates that three plaintiffs — Steven Aceto, James A. Burgess, and

Shelley Cohen — are entitled to awards of $3,000,000 for the cuts they received in the bombing and the psychological symptoms they have suffered since. *See* Aceto Decl. ¶¶ 11–12 (describing a scar on Aceto's hand and symptoms of PTSD); Burgess Decl. ¶ 9 (describing scar on hand from cuts received in the bombing); *id.* ¶ 13 (describing psychological symptoms); Cohen Decl. ¶ 9 (describing cuts on leg and feet); *id.* ¶¶ 16–17 (describing "obsessive" behaviors and feelings of helplessness after the bombing).[14] Aceto and Cohen suffered the sort of "'minor shrapnel injuries or minor injury from small-arms fire,'" *Kaplan*, 213 F. Supp. 3d at 36 (quoting *Valore*, 700 F. Supp. 2d at 84), which, under this court's FSIA cases, receive an award of $3,000,000, *see, e.g.*, *Schooley*, 2019 WL 2717888, at *75 (awarding $3,000,000 to plaintiffs with similar, "comparatively minor" injuries); *Akins*, 332 F. Supp. 3d at 41 (awarding $2,500,000 to victims who sustained cuts from flying glass and psychological injury).

Finally, one plaintiff — Jennifer Scheidel — will receive an award of $1,500,000. Scheidel, who was 3 to 5 miles from the bomb site, suffered "emotional injury without physical injury," and the typical award for such a victim is "$1.5 million." *Kaplan*, 213 F. Supp. 3d at 36 (quoting *Harrison*, 882 F.Supp.2d at 49); *see also, e.g.*, *Akins*, 332 F. Supp. 3d at 41.

Accordingly, Roger Wilson will receive an award of $7,000,000; Greg Cassidy Caldwell and Denny Prier will receive awards of $6,000,000 each; Steven Aceto, James A. Burgess, and Shelley Cohen are entitled to awards of $3,000,000 each; and Jennifer Scheidel, who is also seeking to collect as a family member of Aceto, will receive an award of $1,500,000 for her injuries as a service member.

---

[14] Although Aceto has been rated 50% disabled by the VA, the submitted evidence does not support a finding that the disabilities underlying this rating are attributable to the bombing, and so the disability rating is not used to calculate Aceto's damages award. Aceto's declaration states that his injuries from the bombing were a scar on his right hand, which cannot account for the disability rating, and psychological symptoms, Aceto Decl. ¶¶ 11–12, which were diagnosed as PTSD after he was rated disabled, *id.* ¶ 13. The declaration and attachments do not show what disabilities do underlie his disability rating. *See* Aceto Decl.; *see also* Aceto Decl., Att. (VA Medical Record, dated February 14, 2019).

4. *Solatium*

The 24 immediate–family member plaintiffs seek solatium damages to compensate for the emotional distress they experienced as family members of service-member victims. *See* Compl. ¶ 42. "Solatium is traditionally a compensatory damage which belongs to the individual heir personally for injury to the feelings and loss of decedent's comfort and society," *Fraenkel*, 892 F.3d at 356 (quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 29 (D.D.C. 1998)), but solatium damages have also been awarded to compensate for the emotional distress of the family members of surviving victims, *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 39 (D.D.C. 2012) (explaining that "in the context of distress resulting from injury to loved ones — rather than death — courts have applied a framework where awards are valued at half of the awards to family members of the deceased." (internal quotation marks omitted)); *see also Valore*, 700 F. Supp. 2d at 85 ("Relatives of surviving servicemen received awards valued at half of the awards to family members of the deceased."). "Under the FSIA, a claim for solatium is nearly indistinguishable from a claim for IIED." *Flanagan*, 87 F. Supp. 3d at 115; *see also Fraenkel*, 892 F.3d at 357. Damages recoverable on the family members' claims of IIED thus will be discussed as claims for solatium damages.

"Mental anguish, bereavement and grief resulting from" an immediate family member's death or injury "constitutes the preponderant element of a claim for solatium." *Fraenkel*, 892 F.3d at 356–57 (alteration adopted) (quoting *Flatow*, 999 F. Supp. at 30). In determining the appropriate amount to compensate victims' family members for emotional distress, "the Court may look to prior decisions awarding damages . . . for solatium." *Acosta*, 574 F. Supp. 2d at 29.

Commonly accepted in this Court is *Heiser I*'s standardized framework for solatium damages. *Heiser I*, 466 F. Supp. 2d at 269; *see Roth*, 78 F. Supp. 3d at 403 (noting the "framework has been adopted by other courts as an appropriate measure of solatium damages for

the family members of victims of state-sponsored terror" (citing *Valore*, 700 F. Supp. 2d at 85)). Although the *Heiser* framework is not mandatory, *see Fraenkel*, 892 F.3d at 361 ("There is no statutory basis for concluding that district courts *must* award solatium damages in the amounts that *Heiser* found commonly granted."), it is adopted here for consistency, *see also Akins*, 332 F. Supp. 3d at 43 (adopting the *Heiser* framework for awarding solatium damages); *Schooley*, 2019 WL 2717888, at *77 (same).

The *Heiser* framework, as a baseline, awards spouses of deceased victims $8,000,0000, parents and children of deceased victims $5,000,000, and siblings of deceased victims $2,500,000. *Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1, 15 (D.D.C. 2010). "[F]amilies of victims who have died are typically awarded greater damages than families of victims who remain alive," *Heiser I*, 466 F. Supp. 2d at 269 (quoting *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 75 (D.D.C. 2006)), and so the courts have awarded family members of surviving victims approximately half the baseline awards for family members of the deceased, *see Wultz*, 864 F. Supp. 2d at 39; *Valore*, 700 F. Supp. 2d at 85. Here, then, the applicable baseline solatium awards are $4,000,000 to spouses of surviving victims and $2,500,000 to parents of surviving victims, *see Wultz*, 864 F. Supp. 2d at 39; "[c]hildren of a surviving victim receive $1.5 million on average," *Spencer*, 71 F. Supp. 3d at 28, and siblings of surviving victims receive $1,250,000, *see Valore*, 700 F.Supp.2d at 85.

These numbers serve only as an anchor from which the Court should deviate to compensate for specific circumstances. *See Fraenkel*, 892 F.3d at 362 ("While past solatium awards from comparable cases are appropriate sources of guidance for district courts, different plaintiffs (even under FSIA) will prove different facts that may well (and should) result in different damage awards." (internal quotation marks omitted)). "Decisions to deviate from the

starting points provided by the *Heiser* framework are committed to the discretion of the particular court in each case . . . ." *Oveissi*, 879 F. Supp. 2d at 26; *see also Fraenkel*, 892 F.3d at 351 ("District Court judges have discretion . . . to grant solatium awards based on the particular facts of each case, subject to abuse-of-discretion review for errors of law, clearly erroneous factual findings, and faulty reasoning.").

The damages awards for plaintiff-spouses are addressed first, followed by parents and children, and then siblings.

### a. *Spouses*

Three of the immediate–family member plaintiffs were spouses of service-member plaintiffs at the time of the bombing: Jennifer Scheidel, Dafphanie Burgess, and Vicki Prier. Each spouse has described fear for her spouse's physical well-being in the immediate aftermath of the bombing and the toll that the bombing has taken since on their sense of safety, on their spouses, and on their marriages. *See* Scheidel Decl. ¶¶ 14, 18; D. Burgess Decl. ¶¶ 10–12, 16; V. Prier Decl. ¶¶ 8, 13, 15.

The *Heiser* framework awards spouses of surviving victims $4,000,000. Vicki Prier, whose husband was awarded $6,000,000 will receive an award of $4,000,000.

Where "a proposed solatium award would exceed the pain and suffering award received by a surviving victim," *Spencer*, 71 F.Supp.3d at 28, a "proportional" downward deviation from the *Heiser* framework is "appropriate," *Akins*, 332 F. Supp. 3d at 44; *see also Estate of Bland v. Islamic Republic of Iran*, 831 F.Supp.2d 150, 158 (D.D.C. 2011) (holding that it would be inappropriate for family members to receive a larger award than a service member). Dafphanie Burgess, whose husband was awarded $3,000,000, is thus entitled to $2,000,000. *See Davis*, 882 F. Supp. 2d at 16 (reducing spouse's solatium award to two-thirds of victim's pain and suffering award); *Spencer*, 71 F. Supp. at 28 (same); *Estate of Bland*, 831 F. Supp. 2d at 157 (same).

A further downward departure is appropriate for Jennifer Scheidel, whose ex-husband, Steven Aceto, was awarded $3,000,000. Aceto and Scheidel "separated and divorced" "[a] few years" after the bombing, Scheidel Decl. ¶ 20, and there is no evidence that the two have remained close, or even in touch.[15] Where similar attenuation in a relationship has occurred, courts have recognized that a downward departure is appropriate. *See Valore*, 700 F. Supp. 2d at 87 (departing downward where brothers lost touch). *But see Spencer*, 71 F.Supp.3d at 28–29 (holding that, despite divorce, "[t]he Court need not depart from its usual solatium damages framework as to spouses . . . because evidence . . . indicated that [the couple] were married at the time of the bombing and remained married" for two decades, the victim's wife "suffered compensable emotional trauma as a result of the attack, and at least one witness attributed the dissolution of their marriage to the after effects of the attack"). Scheidel, who has already been awarded $1,500,000 to compensate for her injuries as a service-member plaintiff will receive a solatium award of $1,500,000 for the emotional distress she suffered as Aceto's spouse.

### b. Parents

Thirteen of the immediate–family member plaintiffs will receive awards as parents of service members who were stationed at the Khobar Towers at the time of the bombing: Diane Snow, Beverly Fitzhugh, James H. Burgess, Sandra Caldwell Blanton, Barbara Ann Louisos, Monika Prier, Thomas Prier, Lindsay O'Neil, the estate of Mary O'Neil, Jenny Sills, Frank Sills, Jr., the estate of James Hurst, and Cynthia Hurst. These mothers and fathers have attested to their panic upon learning about the attack and to the continued distress of witnessing their children deal with the psychological after-effects of the attack.[16] These harms are consistent

---

[15]    In contrast, although Dafphanie and James Burgess separated a few years after the attack, they raised their two children together and have "remained close." *See* D. Burgess Decl. ¶¶ 15–17.

[16]    Snow Decl. ¶¶ 8, 10–11, 15; Fitzhugh Decl. ¶¶ 8–12, J.H. Burgess Decl. ¶¶ 8, 12, 15; Blanton Decl. ¶¶ 14, 16; Louisos Decl. ¶¶ 10–13; M. Prier Decl. ¶¶ 7–8, 10; T. Prier Decl. ¶¶ 9–10, 13; L. O'Neil Decl. 10, 14; M. O'Neil

with those suffered by many parents of victims of terrorism. *See Valencia*, 774 F. Supp. 2d at 16.

The parents of the injured service members are each entitled to a baseline award of $2,500,000. *See Akins*, 332 F. Supp. 3d at 44 (awarding $2,500,000 to the parents of injured service members). Here, Sandra Caldwell Blanton, Monika Prier, Thomas Prier, Lindsay O'Neil, the estate of Mary O'Neil, Jenny Sills, and Frank Sills, Jr., will receive an award of $2,500,000 each.

Four plaintiffs — Diane Snow, Beverly Fitzhugh, James H. Burgess, and Barbara Ann Louisos — will receive awards of $1,875,000 each. This downward departure is consistent with the $3,000,000 pain and suffering awards received by these parents' service-member children, and with the solatium awards received by Scheidel, Snow's former daughter-in-law, and by Dafphanie Burgess, Beverly Fitzhugh and James H. Burgess's daughter-in-law.

Finally, Cynthia Hurst and the estate of James Hurst will receive awards of $1,250,000 each. Their son, Kevin Hurst, was awarded $2,500,000 in *Akins*. *See* 332 F. Supp. 3d at 47. In *Akins*, the parents of other service-member victims awarded $2,500,000 were entitled to $1,250,000 in solatium damages. *See id.* at 44.

### c. Children

The three plaintiffs who are children of service members injured in the bombing describe confusion or fear in the immediate aftermath of the bombing, *see* Burnside Decl. ¶ 8; Ziegler Decl. ¶ 5, and attribute difficulties in their relationships with their service-member parents at least in part to the psychological mark the bombing left, *see* B. Burgess Decl. ¶¶ 9–10, 15; Burnside Decl. ¶ 11; Ziegler Decl. ¶ 8, 11. Although Brandi Burgess was too young at the time

---

Decl. ¶¶ 6–7, 11–12; J. Sills Decl. ¶¶ 13, 18–19; F. Sills Decl. ¶¶ 8–9, 14; C. Hurst Decl. ¶¶ 10, 14–15; J. Hurst Decl. ¶¶ 4, 11.

of the bombing to comprehend that her father had been in danger, *see* B. Burgess Decl. ¶ 4 (stating that she was just over a year old on June 25, 1996), this lessened awareness does not lessen the distress Burgess experienced growing up with a father suffering from psychological symptoms from the attack, *see id.* ¶¶ 6, 9–10 (describing these effects on their relationship); *see also Schooley*, 2019 WL 2717888, at *78 (same).

As stated, "[c]hildren of a surviving victim receive $1.5 million on average" under the *Heiser* framework. *Spencer*, 71 F. Supp. 3d at 28. Kaylee Ziegler, whose father, Eric Dale Ziegler, received an award of $5,000,000 in *Akins*, 332 F. Supp. 3d at 47, will receive an award of $1,500,000.

Brandi Burgess and Kendall Burnside will receive awards of $750,000. This downward departure is consistent with the $3,000,000 pain and suffering awards received by their service-member parents, and is proportionate, within the *Heiser* framework, with the solatium awards received by Beverly Fitzhugh and James H. Burgess, Brandi's grandparents, and by Barbara Ann Louisos, Kendall's grandmother.

### d. *Siblings*

Five of the 24 immediate–family member plaintiffs are siblings or half-siblings of service-member plaintiffs: Tene Woods, Brian Wilson, Brian Achilles, Shannon Kimbro, and Kimberly Semlinger. Each has described distress upon learning about the bombing and has suffered from the ongoing effects of the attack on their respective siblings and families.[17] These harms are consistent with those suffered by many siblings of victims of terrorism. *See Valencia*, 774 F. Supp. 2d at 16. These plaintiffs' service-member siblings — Denny Prier, Roger Wilson, and Frank David Sills — were awarded $6,000,000, $7,000,000, and $5,000,000, respectively, so

---

[17] *See* Woods Decl. ¶¶ 8, 11; B. Wilson Decl. ¶¶ 11–12; Achilles Decl. ¶¶ 6, 9; Kimbro Decl. ¶¶ 5–6, 8, 11; Semlinger Decl. ¶¶ 9, 12, 14.

no downward departure for proportionality is required. Within the *Heiser* framework, these siblings of injured service members are each entitled to an award of $1,250,000. *See Akins*, 332 F. Supp. 3d at 45 (awarding a baseline amount of $1,250,000 to siblings of injured service members).

### E. Attorneys' Fees and Costs and Expenses

The plaintiffs also seek "[r]easonable costs and expenses" and "[r]easonable attorneys' fees," Compl. at 19 (Prayer for Relief), but because the plaintiffs have not provided any information regarding the fees and costs sought, the request is denied without prejudice. The plaintiffs may file post-judgment motions for attorneys' fees in accordance with Federal Rule of Civil Procedure 54(d)(2)(B) and for costs in accordance with Federal Rule of Civil Procedure 54(d)(1).

## IV. CONCLUSION

The plaintiffs' motion for default judgment is granted in part and denied in part. The defendant is liable for the pain and suffering inflicted on the seven service-member plaintiffs and for the emotional distress inflicted on the 24 immediate–family member plaintiffs.

The plaintiffs are awarded monetary damages in the following amounts:

- Service-member plaintiff Roger Wilson is entitled to $7,000,000 in pain and suffering damages;

- Service-member plaintiffs Greg Cassidy Caldwell and Denny Prier are each entitled to $6,000,000 in pain and suffering damages;

- Service-member plaintiffs Steven Aceto, James A. Burgess, and Shelley Cohen are each entitled to $3,000,000 in pain and suffering damages;

- Service-member plaintiff Jennifer Scheidel is entitled to $1,500,000 in pain and suffering damages. Jennifer Scheidel is also entitled to $1,500,000 in solatium damages, for a total award of $3,000,0000.

- Plaintiff-spouse Vicki Prier is entitled to $4,000,000 in solatium damages;

- Plaintiff-spouse Dafphanie Burgess is entitled to $2,000,000 in solatium damages;

- Plaintiff-parents Sandra Caldwell Blanton, Monika Prier, Thomas Prier, Lindsay O'Neil, the estate of Mary O'Neil, Jenny Sills, and Frank Sills, Jr. are each entitled to an award of $2,500,000.

- Plaintiff-parents Diane Snow, Beverly Fitzhugh, James H. Burgess, and Barbara Ann Louisos are each entitled to $1,875,000 in solatium damages;

- Plaintiff-parents Cynthia Hurst and the estate of James Hurst are each entitled to $1,250,000 in solatium damages;

- Plaintiff-child Kaylee Ziegler is entitled to $1,500,000 in solatium damages;

- Plaintiff-children Brandi Burgess and Kendall Burnside are each entitled to $750,000 in solatium damages;

- Plaintiff-siblings and half-siblings Tene Woods, Brian Wilson, Brian Achilles, Shannon Kimbro, and Kimberly Semlinger are each entitled to $1,250,000 in solatium damages. Thus, the total damages award is $ 73,750,000.

An appropriate Order accompanies this Memorandum Opinion.


Date: February 7, 2020

_____
BERYL A. HOWELL
Chief Judge